No. 09-15641

———————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————————

LARRY BOWOTO, et al.,

Plaintiffs-Appellants,

vs.

CHEVRON CORPORATION; CHEVRON INVESTMENTS, INC.;
CHEVRON U.S.A., INC.,

Defendants-Appellees.

———————————————

On Appeal from the United States District Court
Northern District of California, No. CV 99-02506 SI
The Honorable Susan Illston

———————————————

**APPELLANTS' OPENING BRIEF**

———————————————

Barbara Enloe Hadsell [S.B. #86021]
Dan Stormer [S.B. #101967]
Lauren Teukolsky [S.B. #211381]
HADSELL STORMER KEENY
RICHARDSON & RENICK LLP
128 North Fair Oaks Avenue
Pasadena, California 91103-3645
Telephone: (626) 585-9600

Theresa Traber [S.B.#116305]
Bert Voorhees [S.B.#137623]
TRABER & VOORHEES
128 North Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9611

Attorneys for Plaintiffs-Appellants
LARRY BOWOTO, ET AL.
[additional counsel continued on next page]

Cindy A. Cohn [S.B. #145997]
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell St.
San Francisco, California 94110
Telephone:  (415) 436-9333, Ext. 108

Richard Herz [S.B. #31312]
Marco Simons [S.B. #237314]
Jonathan Kaufman
EARTHRIGHTS INTERNATIONAL
1612 K Street N.W., Suite 401
Washington, DC 20006
Telephone:  (202) 466-5188

Michael S. Sorgen [S.B. #43107]
LAW OFFICES OF MICHAEL S.
SORGEN
240 Stockton Street, 9th Floor
San Francisco, California 94108
Telephone:  (415) 956-1360

Jose Luis Fuentes [S.B. #192236]
SIEGEL & YEE
499 14th Street, Suite 220
Oakland, CA 94612
Telephone: (510) 839-1200

Anthony Dicaprio
RATNER, DICAPRIO &
CHOMSKY, LLP
110 E. 59th Street
New York, NY 10022
Telephone:  (212) 604-9466

Richard R. Wiebe [S.B. #121156]
LAW OFFICE OF RICHARD R.
WIEBE
425 California Street, #2025
San Francisco, CA 94104
Telephone: (415) 433-3200

Judith Brown Chomsky
LAW OFFICES OF JUDITH
BROWN CHOMSKY
Post Office Box 29726
Elkins Park, PA 19027
Telephone:  (215) 782-8367

Paul Hoffman [S.B. #71244]
SCHONBRUN, DESIMONE,
SEPLOW, HARRIS & HOFFMAN
LLP
723 Ocean Front Walk
Venice, California 90291
Telephone:  (310) 396-0731

# TABLE OF CONTENTS

**Page(s)**

**TABLE OF AUTHORITIES** .................................................................. iv

I.  **INTRODUCTION** ........................................................................ 1

II.  **STATEMENT OF JURISDICTION** .......................................... 3

III.  **ISSUES PRESENTED FOR REVIEW** ....................................... 3

IV.  **STATEMENT OF THE CASE** .................................................. 4

V.  **STATEMENT OF FACTS** ......................................................... 6

    A.  **The Nigerian Military Regime, CNL, and Oil Production in the Niger Delta** .................................. 6

    B.  **CNL Relied on the GSF to Provide Security** ................................. 7

    C.  **The Protest at the Parabe Platform** ........................ 8

    D.  **CNL Transported, Paid and Supervised the GSF Deployed to Parabe Who Shot the Plaintiffs** .................................................................. 10

    E.  **Larry Bowoto Was Shot and Injured** ........................... 11

    F.  **Arolika Irowarinun Was Shot and Killed** .................... 11

    G.  **Plaintiff Bassey Jeje Was Shot and Injured** ................. 12

    H.  **Plaintiff Bola Oyinbo Was Detained and Tortured** .................... 12

    I.  **Defendants Exercised Unusually Tight Control Over CNL** .................................................................. 13

    J.  **The District Court Admitted Significant Evidence Regarding Violence By Others in Plaintiffs' Ethnic Group** .................................................................. 14

VI.  **SUMMARY OF ARGUMENT** ................................................. 15

VII.  **ARGUMENT** ........................................................................... 18

i

A.  The District Court Erroneously Admitted Irrelevant and Prejudicial Evidence ................................................. 18

    1.  Standard of Review ................................................. 18

    2.  The District Court Erred in Admitting Evidence of the Tugboat Kidnapping ................................................. 19

    3.  The District Court Erred in Admitting Photographs of Protesters Using A Machete to Butcher a Sea Turtle ................................................. 28

    4.  The District Court Erred in Admitting Prejudicial Multiple-Level Hearsay Statements From Two Individuals Not on the Barge ................................................. 31

    5.  The District Court Erred in Admitting Evidence of Four Prior Kidnappings ................................................. 36

    6.  The District Court's Erroneous Evidentiary Rulings Prejudiced Plaintiffs ................................................. 39

B.  The District Court's Jury Instructions Misstated the Law on Plaintiffs' Assault and Battery Claims and Used Misleading Language on Chevron's Supposed Law Enforcement Reporting Privilege ................................................. 43

    1.  Standard of Review ................................................. 43

    2.  The Assault and Battery Jury Instructions Do Not Reflect Applicable Law ................................................. 44

        a.  The District Court Improperly Required Plaintiffs to Prove that the GSF Used Unreasonable Force And Removed Defendants' Burden to Prove their Affirmative Defenses ................................................. 45

        b.  The District Court Improperly Instructed the Jury on Unreasonable Force for the California-Law Battery Claim ................................................. 47

c.  The District Court Erroneously Removed
the Affirmative Defense Instructions ........................ 49

3.  The District Court's Instructions on Crime
Reporting Duties and Privileges Are Inapplicable
and Incomplete ...................................................................... 52

C.  The District Court Erred in Dismissing the
Irowarinun Family's Claims for Violations of
International Law ...................................................................... 53

1.  Standard of Review ................................................................ 53

2.  The District Court Erred in Finding ATS
Claims Superseded by the Death on the High
Seas Act ................................................................................. 54

a.  DOHSA Does Not Supersede ATS
Claims for Death ............................................... 54

b.  DOHSA Does Not Supersede ATS
Survival Claims ................................................. 57

3.  The District Court Erroneously Ruled that
the TVPA Does Not Apply to Corporations ....................... 58

VIII. CONCLUSION ........................................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*America Insurance Co. v. 356 Bales of Cotton*
    26 U.S. 511 (9th Cir. 1828) ....................................................... 56

*B.K.B. v. Maui Police Department*
    276 F.3d 1091 (9th Cir. 2002) ................................................... 18

*Blind-Doan v. Sanders*
    291 F.3d 1079 (9th Cir. 2002) ............................................. passim

*Bowoto v. Chevron Corp.*
    2007 WL 2349341 (N.D. Cal. Aug. 14, 2007) .......................... 61

*Bowoto v. Chevron Corp.*
    2006 U.S. Dist. LEXIS 63209 (N.D. Cal. Aug. 22, 2006) ......... 59

*Caballero v. City of Concord*
    956 F.2d 204 (9th Cir. 1992) ....................................... 43, 44, 46

*Clem v. Lomeli*
    566 F.3d 1177  (9th Cir. 2009) ..................................... 46, 48, 49

*Clinton v. New York*
    524 U.S. 417 (9th Cir. 1998) ..................................................... 59

*Dang v. Cross*
    422 F.3d 800 (9th Cir. 2005) .............................................. 44, 49

*Doe v. Abbott Laboratoriess*
    571 F.3d 930 (9th Cir. 2009) ..................................................... 53

*Dooley v. Korean Air Lines Co., Ltd.*
    524 U.S. 116 (9th Cir. 1998) .............................................. 57, 58

*Dugas v. National Aircraft Corp.*
    438 F.2d 1386 (3d Cir. 1971) .................................................... 57

*Hansen v. White*
    947 F.2d 1378 (9th Cir. 1991) .................................................. 54

*Jacobs v. Northern King Shipping Co., Ltd.*
    180 F.3d 713 (5th Cir. 1999) ....................................................... 57

*Jerden v. Amstutz*
    430 F.3d 1231 (9th Cir. 2005) ..................................................... 18

*Kernan v. American Dredging Co.*
    355 U.S. 426 (9th Cir. 1958) ....................................................... 57

*Milwaukee v. Illinois*
    451 U.S. 304 (9th Cir. 1981) ....................................................... 56

*Mobil Oil Corp. v. Higginbotham*
    436 U.S. 618 (9th Cir. 1978) ....................................................... 55

*Moragne v. States Marine Lines*
    398 U.S. 375 (9th Cir. 1970) ................................................. 54, 55

*NAACP v. Claiborne Hardware Co.*
    458 U.S. 886 (1982) ................................................................... 24

*Norwood v. Vance*
    572 F.3d 626 (9th Cir. 2009) ....................................................... 49

*Offshore Logistics, Inc. v. Tallentire*
    477 U.S. 207 (9th Cir. 1986) ................................................. 54, 55

*Oviatt v. Pearce*
    54 F.2d 1470 (9th Cir. 1992) ....................................................... 43

*Posadas v. National City Bank*
    296 U.S. 497 (9th Cir. 1936) ....................................................... 55

*Romero v. Drummond Co.*
    552 F.3d 1303 (11th Cir. 2008) .................................................... 58

*Sinaltrainal v. Coca-Cola Co.*
    __ F.3d __, 2009 U.S.App. LEXIS 17764 (11th Cir. Aug. 11, 2009) ......... 61

*Sosa v. Alvarez-Machain*
    542 U.S. 692 (9th Cir. 2004) ................................... 18, 55, 56, 60

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*
        370 U.S. 19 (9th Cir. 1962) ........................................................ 52

*Traver v. Meshriy*
        627 F.2d 934 (9th Cir. 1980) .................................................... 48

*United States v. Ayers*
        924 F.2d 1468 (9th Cir. 1991) ............................................ 23, 25

*United States v. Bland*
        908 F.2d 471 (9th Cir. 1990) .................................................... 36

*United States v. Bracy*
        67 F.3d 1421 (9th Cir. 1995) .................................................... 27

*United States v. Brown*
        767 F.2d 1078 (4th Cir. 1985) .................................................. 36

*United States v. Curtin*
        489 F.3d 935 (9th Cir. 2007) .................................................... 22

*United States v. DeGeorge*
        380 F.3d 1203 (9th Cir. 2004) ............................................ 21, 22

*United States v. Fernandez*
        892 F.2d 976 (11th Cir. 1989) .................................................. 35

*United States v. Haywood*
        280 F.3d 715 (6th Cir. 2002) .................................................... 25

*United States v. Hitt*
        981 F.2d 422 (9th Cir. 1992) .................................................... 30

*United States v. Hodges*
        770 F.2d 1475 (9th Cir. 1985) ............................................ 25, 27

*United States v. Middleton*
        231 F.3d 1207 (9th Cir. 2000) ............................................ 58, 59

*United States v. Nelson*
        137 F.3d 1094 (9th Cir. 1998) .................................................. 25

*United States v. Schemenauer*
    238 Fed. Appx. 248 (9th Cir. 2007) ........................................................ 27

*United States v. Texas*
    507 U.S. 529 (9th Cir. 1993) ..................................................... 56

*United States v. Vizcarra-Martinez*
    66 F.3d 1006 (9th Cir. 1995) ............................................. 22, 39

## STATE CASES

*Boyer v. Waples*
    06 Cal. App. 2d 725 (1962) ........................................ 51

*Brown v. Ransweiler*
    171 Cal. App. 4th 516 (2009) ................................... 47

*Carlson v. Wald*
    51 Cal. App. 3d 598 (1984) ..................................... 51

*Cervantez v. J.C. Penney Co., Inc.*
    24 Cal.3d 579 (1979) ............................................. 48

*Edson v. City of Anaheim*
    63 Cal. App. 4th 1269 (1998) ................................... 47

*Munoz v. City of Union City*
    120 Cal. App. 4th 1077 (2004) ................................. 48

*Tiedemann v. Superior Court*
    83 Cal. App. 3d 918 (1978) ..................................... 53

## NIGERIAN CASES

*Ezeadukwa v. Maduka*
    8 NWLR 635 (1997) .................................................. 52

## BRITISH CASES

*Ashley v. The Chief Constable of Sussex Police*
    [2006] EWCA Cal. 1085 (July 27, 2006) ........................ 45, 46, 51

# FEDERAL STATUTES

28 U.S.C.
  § 1291 ............................................................................................ 3
  § 1331 ............................................................................................ 3
  § 1332 ............................................................................................ 3
  § 1350 ...................................................................................... 3, 58
  § 1367 ............................................................................................ 3

Death On The High Seas Act
  46 U.S.C. §§ 30301-30308 ................................................... 54

Dictionary Act
  1 U.S.C. § 1 ................................................................................ 59

Fed. R. Evid.
  Rule 402 ........................................................................ 16, 30, 38
  Rule 403 .................................................................................. 3, 20
  Rule 404 ................................................................................ 23, 24
  Rule 801 ................................................................................ 33, 34

Outer Continental Shelf Lands Act
  46 U.S.C. § 1331-1356a .......................................................... 55

# MISCELLANEOUS

S. Rep. No. 102-249 (1991)
  1991 WL 258662 .......................................................... 59, 60, 61

*Breach of Neutrality*
  1 Op. Atty. Gen. 57 (1795) .................................................... 56

# I. INTRODUCTION

On May 25, 1998, Larry Bowoto, Bassey Jeje, Arolika Irowarinun, Bola Oyinbo and over 100 other Nigerians traveled to the Parabe oil platform and an adjacent barge off the coast of Nigeria to protest Chevron's destruction of their livelihoods and harmful environmental practices that were killing the fish, fouling the drinking water, and polluting the air on which they depended. Three days later, after the protestors had made the decision to leave, Nigerian soldiers stormed the platform in a helicopter-borne attack, opening fire on the protestors. The decision to send the soldiers to storm the platform was made by Chevron Nigeria Limited (CNL), which transported, supervised and paid the troops.

The soldiers shot four of the protestors, including Bowoto, who was severely wounded; Jeje, who was also beaten; and Irowarinun, who died. Oyinbo was detained and tortured for refusing to sign a false confession. This lawsuit centers on whether Chevron is liable for Irowarinun's injuries and death and the injuries suffered by Bowoto, Jeje and Oyinbo.

Plaintiffs filed this action in 1999. After extensive pretrial proceedings, the case was tried in 2008. The jury returned a verdict for Chevron, but that verdict is fatally defective for several reasons.

The district court erred in admitting extensive evidence proffered by Chevron of violent conduct by Nigerians other than the plaintiffs, much of which

occurred after plaintiffs were shot and taken into custody. Chevron presented this evidence for the improper and prejudicial purpose of using the actions of other members of plaintiffs' ethnic group – the Ilaje – to paint plaintiffs in the eyes of the jurors as wild and violent kidnappers full of bloodlust. Chevron sought to convince the jury that for plaintiffs and other Ilajes – an ethnic group with which none of the jurors had any personal experience – "hostage-taking, kidnapping was part of their mind set. It's something they would do." ER:3162-63 (defense closing argument).

The district court also committed prejudicial errors in instructing the jury on plaintiffs' assault and battery claims and on Chevron's defenses. The court erroneously imposed on plaintiffs the burden of proving beyond a reasonable doubt that their attackers used unreasonable force, and relieved Chevron of its duty to prove self-defense and other affirmative defenses. The district court also erred in instructing the jury about Chevron's supposed "privileges" to make reports to law enforcement and assist the police, even though these defenses are not available under Nigerian law, which the court had held applied.

Finally, the district court wrongly dismissed Irowarinun's human rights claims under the Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA"). The court concluded that ATS claims are superseded by the Death on the High Seas Act ("DOHSA"), even though DOHSA was enacted to provide a

remedy for wrongful deaths on the high seas where none previously existed, not to displace existing non-maritime federal remedies. It further ruled that TVPA claims cannot be asserted against corporations, a ruling that is unsupported by legislative history and that creates the illogical result that aliens, but not U.S. citizens, may sue corporations for torture and summary execution.

These errors require reversal and a new trial.

## II. STATEMENT OF JURISDICTION

The district court had jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331 and 28 U.S.C.§ 1350. The district court had supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' California and Nigerian law claims, and diversity jurisdiction under 28 U.S.C. § 1332 over all claims.

After a jury verdict in defendants' favor on all claims, the district court entered judgment on December 2, 2008, ER:7, and denied plaintiffs' motion for a new trial on March 4, 2009. ER:75-81. Plaintiffs timely appealed. ER:1-253. This Court has jurisdiction under 28 U.S.C. § 1291.

## III. ISSUES PRESENTED FOR REVIEW

1.  Did the district court err in admitting evidence at trial of violent acts allegedly committed by members of plaintiffs' ethnic group, where such evidence was irrelevant to the issues in the case, the court failed to engage in Fed. R. Evid. 403 balancing, and the evidence was unfairly prejudicial?

2.      Did the district court err in instructing the jury that plaintiffs asserting
        battery claims bore the burden of proving beyond a reasonable doubt that
        their attackers had used unreasonable force and in relieving Chevron of any
        obligation to prove its affirmative defenses?

3.      Did the district court err in providing "Privileges, Duties and Defenses"
        instructions applicable to plaintiffs' negligence claims that were incomplete
        and misleading?

4.      Did the district court err in ruling that the Irowarinun family's claims under
        the ATS – a preexisting, non-maritime federal remedy that has applied for
        two centuries to cases on the high seas – were preempted by DOHSA, which
        was enacted in 1920 to provide a federal remedy for wrongful death on the
        high seas where none previously existed?

5.      Did the district court err in ruling that corporations are exempt from TVPA
        liability, where excluding corporations is unsupported by legislative history
        and produces illogical results?

## IV.  STATEMENT OF THE CASE

Plaintiffs Bowoto and Jeje and the survivors of decedents Irowarinun and

Oyinbo[1] filed this action against Chevron Corporation in 1999.  Subsidiaries

Chevron Investments, Inc. and Chevron U.S.A., Inc. (together with Chevron

_____

[1] Oyinbo later died of causes unrelated to the injuries at issue in this lawsuit.

Corp., "Chevron" or "defendants"), were later added as defendants. All defendants are headquartered in California.

The complaint alleged that the Nigerian Government Security Forces ("GSF"), who were agents of Chevron Nigeria Limited ("CNL"), Chevron's wholly-owned subsidiary in Nigeria, used excessive force to quell an unarmed protest. Bowoto and Jeje were shot, Irowarinun was killed, and Oyinbo was later tortured.

The claims that ultimately went to the jury were ATS claims for torture and cruel, inhuman and degrading treatment; and for assault, battery, negligence, wrongful death and intentional infliction of emotional distress under Nigerian and California law. *See* ER:15-71 (jury instructions). Before trial, the district court dismissed plaintiffs' TVPA claims because it found that corporations were exempt, ER:126-28, and dismissed the Irowarinun family's ATS claims because it found them superseded by DOHSA, ER:184-86, ER:205.

Plaintiffs' theory at trial was that CNL was directly liable for plaintiffs' injuries because it was negligent in relying on the GSF in quelling the protest, or vicariously liable for the GSF's actions under various theories, including that the GSF were acting as CNL's agent during the attack. Plaintiffs further asserted that Chevron was liable for the attacks because CNL was its agent, among other theories.

The jury returned a verdict in defendants' favor, and judgment was entered on December 2, 2008. ER:7. Plaintiffs moved for a new trial, which was denied on March 4, 2009. ER:75-81. On April 2, 2009, plaintiffs filed their notice of appeal. ER:1-253.

## V.  STATEMENT OF FACTS

### A.  The Nigerian Military Regime, CNL, and Oil Production in the Niger Delta

The Sani Abacha regime in place in May 1998 is widely considered the "darkest and most brutal" of the succession of military governments that ruled Nigeria from 1966 to 1999. ER:721, ER:756. The regime committed massive human rights abuses against its own people, particularly those who protested oil industry practices. ER:725-26, ER:754-59, ER:1320, ER:3673-3704. CNL manager Scott Davis testified that the Abacha regime was a "ruthless dictatorship" that would "stop at nothing," and that "violence was a normal tool" that the regime used to fleece the country of its wealth. ER:1320-21.

CNL has operated in the Niger Delta, where most of Nigeria's oil is produced, since 1961. ER:570, ER:3707. During the period relevant here, CNL produced oil in a joint venture with the Nigerian military government. CNL has pumped oil worth billions of dollars of oil from the Delta, but the local populace has largely been excluded from any benefits of the oil located in their territory.

ER:722-23, ER:724-25, ER:742-43, ER:749-51.  Instead, local people have

suffered as fisheries have been destroyed, drinking water has been polluted, and

forests have been killed by CNL's oil spills, gas flaring, and canal dredging.

ER:614, ER:615, ER:624-25, ER:632-39, ER:651-53, ER:892-95; ER:1328-30.

**B.      CNL Relied on the GSF to Provide Security**

As part of CNL's partnership with the Nigerian government, CNL relied on

the Nigerian Government Security Forces – military and police – to provide

security.  ER:1333, ER:1345-46.  CNL pays to supplement these troops'

government salaries.  ER:1023-27, ER:1338, ER:1347, ER:2023-24, ER:2027-28,

ER:3710-14, ER:3657-59.  CNL houses and feeds the GSF members it uses for

security.  ER:1332, ER:1337, ER:2040-41.  CNL provides transportation for GSF

members in CNL boats and helicopters, and its employees supervise and discipline

the GSF members that CNL uses.  ER:1332-33, ER:1337, ER:1342-43, ER:1345;

ER:2710, ER:2712, ER:2035-06.

Before the Parabe incident, CNL had significant problems with violent acts

by the GSF members who provided security.  CNL's own employees perceived the

GSF members to be "out of control" and "a greater threat" to CNL employees

"than anything that the communities might try to do."  ER:1351-54; ER:3705.

## C.     The Protest at the Parabe Platform

Against this backdrop, and after several attempts to enter into discussions with CNL about the damage to them and their communities caused by CNL's operations, ER:3613-31, ER:653-59, plaintiffs and others decided to stage a protest at CNL's offshore facilities.  ER:900.  On May 25, plaintiffs and approximately 100 others traveled to the Parabe oil platform and adjacent CBL-101 barge, which housed CNL subcontractors working on the platform.  As documented in a contemporaneous CNL report, the protesters were unarmed. ER:3603, ER:797, 809.  Throughout the protest, GSF members armed with rifles were present providing security on the barge and platform.  ER:788-90, ER:825-26, ER:1383-84, ER:1414-16.

After they arrived, the protesters on the barge requested that CNL management meet with their elders onshore to discuss their demands for environmental cleanup and jobs.  They were informed that CNL's Deji Haastrup would visit the barge the next day to meet with them.  ER:910-15.

On May 26, Haastrup came to the barge accompanied by armed GSF. ER:917-18.  Haastrup agreed to meet the elders onshore the next day.  ER:919-20, 925-26.  On May 27, Haastrup and CNL's Sola Adebawo met with the elders in a village.  Adebawo and one of the villagers who participated in the negotiations both testified that Haastrup and the elders reached agreement on several issues,

and that the elders agreed that the protesters would leave Parabe. ER:2255, ER:2215-16. According to Haastrup, negotiations broke down and there was no agreement that the protesters would leave. ER:2323-25, ER:2454-68.

After the meeting, the elders sent a messenger to Parabe to tell the protesters that the community and CNL had agreed on a number of issues and that they should leave the following morning, May 28. ER:928-29. The protesters then prepared to leave. ER:944-45.

However, unbeknownst to the protesters, CNL had already decided by the evening of May 27 to use the GSF to forcibly remove them from the barge. Beginning on May 25, CNL had convened a crisis management team to monitor the Parabe situation. ER:1356, ER:1371. Scott Davis was the highest-ranking CNL employee on the team. On May 27, Davis decided to call in the GSF to "evict" the protesters. ER:2764-66; ER:3611. His decision was approved by CNL's Managing Director and Tom Schull, CNL's second-in-command. ER:1389-91.

Davis's testimony makes clear that CNL controlled the timing and manner of the military operation. Davis testified that it was his decision to send the GSF to Parabe, ER:1391, and that he could have chosen to keep negotiating rather than send the GSF. ER:1397-98, ER:2764, ER:2766. He further testified that CNL management made decisions about the manner of the military operation, including

that the GSF would first use teargas and then lethal force if the protesters fought back. ER:1394.

## D. CNL Transported, Paid and Supervised the GSF Deployed to Parabe Who Shot the Plaintiffs

Once CNL decided to send in the military, James Neku, a high-level CNL security employee, contacted the Nigerian Navy. ER:2155-56. In the early morning of May 28, CNL pilots flew three CNL-leased helicopters, transporting armed GSF personnel and Neku to the barge. ER:1334-36, ER:2158. Extensive undisputed evidence at trial showed that CNL paid the GSF. ER:1023-27, ER:2027-28, ER:3710-14, ER:3657-59. Although there was some dispute about the number of shots fired, and when the shooting began, it is undisputed that the GSF who disembarked from the helicopters shot teargas and also fired their weapons toward the protesters. ER:946.

Neku directed the GSF's actions at Parabe. One CNL contractor testified that Neku used a bullhorn to direct the GSF. ER:1419-25. Neku testified that he gave a bullhorn to Lieutenant Sadiq (the highest-ranking GSF present) and gave Sadiq instructions about how the military operation should be executed and what to tell the protesters. ER:2157-58.

### E.    Larry Bowoto Was Shot and Injured

After Larry Bowoto heard that CNL had brought in the GSF, he ran toward
the barge from the platform with his hands up, shouting, "We are community
protester [sic].  Don't shoot us."  ER:947-48.  Bowoto then heard the command,
"Shoot him," and was shot multiple times.  ER:948, ER:958-59; ER:1874.
Bowoto survived but was severely wounded.  ER:1903-04, ER:1509-10.  No
evidence controverted Bowoto's testimony that he was not resisting arrest or using
force when the GSF shot him.

### F.    Arolika Irowarinun Was Shot and Killed

It is undisputed that the GSF shot and killed Arolika Irowarinun, along with
another protester, Joli Ogungbege, whose claims are not asserted in this case.  At
trial, there was conflicting testimony about whether Irowarinun and Ogungbege
were attacking the GSF when they were shot.  One protester testified that
Irowarinun was not charging the soldiers and had nothing in his hands when he
was shot.  ER:3291-94.  Two CNL subcontractors testified that two unidentified
protesters were charging the soldiers with metal pipes raised over their heads
when they were shot.  ER:3574-76, ER:3528-29.

According to the coroner who performed the autopsies, Ogungbege was
shot in the back, making it unlikely that he charged the soldiers as described by
CNL's subcontractors.  ER:3347-49, ER:3670 (Ogungbege is referred to as "Jolly

Adehin" in the autopsy report).  The coroner also testified that Irowarinun was shot in his left upper chest, near the armpit.  ER:3345, ER:3671.

## G.     Plaintiff Bassey Jeje Was Shot and Injured

Bassey Jeje testified that he was crossing from the platform to the barge, toward soldiers who were shooting, "to appeal to them not to kill us."  ER:3265-66.  After he saw that Irowarinun had been killed and that Bowoto had been shot, he fled back to the platform.  As he fled, a soldier shot him.  ER:3266-69.  Defendants introduced no evidence at trial to suggest that Jeje was doing anything that justified the GSF in shooting him.

After Jeje was shot, he fell and attempted to hide.  ER:3269.  A soldier found him and beat him with a rifle butt.  ER:3270, ER:1876.  Defendants submitted no evidence that Jeje was engaging in threatening conduct when the GSF beat him.

## H.     Plaintiff Bola Oyinbo Was Detained and Tortured

After the shootings, the GSF locked Bola Oyinbo, one of the protest leaders, and eleven others in a container on the barge.  ER:832-34, ER:1508-09.  They hit, kicked, and beat him and the others with a rifle butt and a horsewhip.  ER:3294-95, ER:1905-08, ER:2054.  Later, these soldiers beat Oyinbo at CNL's Escravos facility while they transferred him to a Sea Truck (a CNL-leased boat) headed to Warri, a nearby city.  ER:1908-09.  The same soldiers beat Oyinbo again at Warri.

ER:1910-12, ER:2056, ER:3298. The GSF who beat Oyinbo at each place were the same ones that CNL brought to Parabe. ER:1907, ER:1909-10, ER:1933-34; ER:2056.

Oyinbo was next transported to a police station in Akure where he was tortured. Oyinbo and the other detainees were confined in a cell at Akure, in horrific conditions, for twenty days. ER:3302, ER:1912-15. Undisputed testimony showed that Oyinbo was repeatedly tortured, including being hung by his wrists from a ceiling fan and whipped, to try to extract a confession. ER:3303-05, ER:1914-15, ER:2060-61.

## I. Defendants Exercised Unusually Tight Control Over CNL

At trial, plaintiffs presented evidence that defendants were responsible for the acts of CNL under an agency theory, among others. To this end, plaintiffs put on extensive evidence demonstrating that, compared to the typical parent-subsidiary relationship, defendants exercised unusually tight control over CNL. ER:1697-1703, ER:1707-08, ER:1737-38, ER:3632-36, ER:3667-68, ER:3739-43. CNL acted in Chevron's interests rather than strictly its own. CNL in turn, was so important to defendants that they would have stepped in to conduct operations in Nigeria in CNL's absence. ER:1703-04, ER:1768-69.

Chevron held itself out as an "integrated" oil company; for CNL, this meant that it sold all of its oil through related Chevron companies, purchased goods and

services through Chevron companies, and functioned under Chevron's policies. ER:1712-18, ER:1721-25, ER:1733-41. There was substantial overlap between the officers, directors and managers of the defendants and CNL, and personnel regularly rotated employment between the U.S. defendants and CNL. ER:1726-32, ER:3604-06, ER:3717-38.

Unrebutted evidence at trial showed defendants' control of and involvement in CNL's security practices, including Chevron's approval of CNL's payments to the GSF. ER: 1747-48, ER:3599-3601, ER:2179-80, ER:2187-89, ER:2192-93, ER:2195-2200. Further, undisputed evidence showed that CNL regularly communicated with defendants' media relations staff regarding security, including records of communications between CNL and defendants about the protesters' arrival at Parabe and a high volume of communications throughout the protest. ER:2263-64, ER:2268-69, ER:2279-81, ER:2289, ER:3660, ER:3715-16.

## J. The District Court Admitted Significant Evidence Regarding Violence By Others in Plaintiffs' Ethnic Group

Plaintiffs are members of the Ilaje ethnic group. At trial, over plaintiffs' objections, Chevron introduced significant evidence regarding violent acts allegedly committed by members of the Ilaje ethnic group other than plaintiffs. The court admitted evidence of such acts committed years before the Parabe

incident, as well as acts committed after the barge attack was over. The district court's admission of this evidence is central to this appeal and includes:

- Testimony that, after the GSF attack was over, and after Bowoto, Irowarinun and Jeje had been shot and Oyinbo detained, some of the remaining fleeing protesters took the crew of a tugboat located near the barge ashore against their will and held them there for several days;

- Photographs of Ilaje protesters on the tugboat using a bloody machete to butcher a sea turtle for food;

- Multiple-level hearsay testimony from two CNL employees, Hervey and Stapleton, who were not present at Parabe, regarding violent acts of other protesters on the barge and tugboat;

- Testimony from CNL's Haastrup about four prior kidnappings allegedly committed by other Ilajes in 1996 and 1997.

In opening and closing argument, defense counsel relied extensively on this evidence, using the four prior kidnappings and the taking of the tugboat crew to argue that "hostage-taking" and "kidnaping" were part of the "mind set" of the Ilajes – "It's something that they would do." ER:3162-63.

## VI. SUMMARY OF ARGUMENT

The district court abused its discretion in admitting a significant amount of irrelevant and unduly prejudicial evidence, including the subsequent tugboat

kidnapping, the sea turtle photos, multiple-hearsay reports of violence and threats on the barge, and the four prior kidnappings.  This evidence was irrelevant because: (1) it did not tend to show that the GSF were justified in injuring the plaintiffs since it did not involve the plaintiffs; and (2) it was not known to CNL's decisionmakers when they decided to use the military at Parabe, and therefore did not tend to show that CNL was justified in this decision.  Because it was irrelevant, the evidence should not have been admitted.  Fed. R. Evid. 402.

Even if this evidence was marginally relevant, it should have been excluded under Rule 403 because any relevance was substantially outweighed by unfair prejudice.  However, the district court did not engage in the balancing required under Rule 403 for any of this evidence.  Although the Ninth Circuit requires that a district court must make some record of Rule 403 balancing, the district court here largely failed to explain why the evidence was relevant, or why it was admitting the evidence despite plaintiffs' prejudice objections.

The district court's errors require reversal because such incendiary evidence more likely than not affected the jury's verdict. This is particularly so since overwhelming evidence, mostly undisputed, supported liability by proving that Bassey Jeje, Bola Oyinbo and Larry Bowoto were brutalized without legal justification: Oyinbo was tortured in custody; Jeje and Bowoto were shot even

though they were not resisting arrest; the GSF who committed the abuses were CNL's agents; and defendants are liable because CNL was their agent.

The district court also committed prejudicial errors in instructing the jury. Contrary to Nigerian law, the battery instructions improperly imposed on plaintiffs the burden of proving unreasonable force beyond a reasonable doubt and relieved Chevron of the duty to prove self-defense or any other affirmative defense. Further, these instructions were also error under California law because they assumed that the GSF were acting within their capacity as police officers, when in fact the evidence showed that they were paid, transported, supervised and controlled by CNL. Finally, the district court's instructions on "privileges, duties and defenses" were erroneous for many reasons, including that they allowed a California statutory privilege as a defense to Nigerian claims and failed to provide a complete instruction of the burden Chevron should have shouldered to prove its defenses. Each of these instructional errors gives rise to a presumption of prejudice that Chevron cannot rebut.

The district court also erred in dismissing Irowarinun's human rights claims under the ATS and the TVPA. First, the court erred in holding that the DOHSA supersedes ATS claims on the high seas because DOHSA was not intended to displace preexisting, non-maritime federal remedies like the ATS. Second, despite caselaw indicating that the word "individual" can include corporations and the fact

that excluding corporations from the TVPA's reach would lead to illogical results, the court erroneously read *Sosa v. Alvarez-Machain,* 542 U.S. 692, 725-28 (2004), to require limiting the meaning of the word "individual" in the TVPA to natural persons.

## VII.  ARGUMENT

## A.  The District Court Erroneously Admitted Irrelevant and Prejudicial Evidence

### 1.  Standard of Review

A district court's evidentiary rulings are reviewed for an abuse of discretion, *Blind-Doan v. Sanders*, 291 F.3d 1079, 1082 (9th Cir. 2002), as is the denial of a motion for a new trial.  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1104 (9th Cir. 2002).  This Court "will reverse if an erroneous [evidentiary] ruling more probably than not affected the jury's verdict."  *Blind-Doan*, 291 F.3d at 1082 (reversal required where lower court did not engage in required Rule 403 balancing and excluded evidence that probably would have affected the jury's verdict).

The district court's erroneous evidentiary rulings should be considered cumulatively.  *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir. 2005) ("[C]umulative error in a civil trial may suffice to warrant a new trial even if each error standing alone may not be prejudicial.") (citations omitted).

### 2. The District Court Erred in Admitting Evidence of the Tugboat Kidnapping

During the Parabe incident, a tugboat was positioned near the barge. On May 25, several protesters boarded the tugboat and stayed onboard throughout the protest. None of the plaintiffs boarded the tugboat or controlled or directed those who did, and the attack on plaintiffs did not occur there.

On May 28, after the GSF attack concluded, the villagers took the tugboat crew to shore against their will. By this time, Bowoto, Jeje and Irowarinun were already shot, and Oyinbo was already detained. The protesters forced the crew to stay onshore for several days before releasing them unharmed.

In his opening statement, defense counsel told the jury that the tugboat's captain, David Schools, would describe how the protesters kidnapped him and his crew. Counsel stated: "[Schools] didn't know where he was, and he didn't know if he or his crew would ever get out alive." ER:568.

During trial, defendants introduced Schools's video testimony, in which he testified at length about events after the shootings on the barge were over. He testified that the protesters onboard the tug – whom Schools referred to as "pirates" – demanded that he take the tug to shore. ER:3467-38. The "pirates" then dragged Schools and the crew off the tugboat. ER:3469-71. The "pirates" took them to a village where "there were hundreds of people on the beach . . .

shouting and waving and shaking their fists," and there was a "carnival kind of atmosphere." ER:3471-72.

Schools further testified that during the night on May 30, two days after the attack, one of the Ilaje elders woke him, telling him that he was not safe, and moved him elsewhere. ER:3478-79. Schools testified that on May 31, he woke up "sick" with "diarrhea" and thought he had "dysentery." ER:3480. Schools testified that he did not feel free to leave the village from May 28 to May 31, when he was released. ER:3482-83. Schools' testimony had no connection to plaintiffs; plaintiffs did not participate in and were not present at any of the post-attack events to which he testified.

The district court erred in admitting Schools' testimony because the evidence was irrelevant and because any marginal probative value of this evidence was greatly outweighed by its prejudice. *See* Fed. R. Evid. 403. The court further erred by failing to engage in or make a record of Rule 403 balancing.

Before trial, plaintiffs moved to exclude the post-attack tug incident. In denying plaintiffs' motion, the court commented only, "I think, generally, everything that happened in the days surrounding the events on the platform is more or less relevant." ER:281. The court's order finalizing its ruling did not include any reasoning or Rule 403 balancing. ER:11. At trial, plaintiffs renewed their objections, which the court overruled without explanation. ER:3885-3941.

Only after the trial was over and plaintiffs filed a motion for a new trial did the district court offer any reasons for its earlier ruling that the post-attack tug evidence was relevant. First, citing *United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004), the court stated that the events on the barge and tug were "so closely related" that they were part of the "same incident." ER:79.

The differences between this case and *DeGeorge* demonstrate why the tugboat evidence should have been excluded. In *DeGeorge*, a criminal defendant was accused of trying to sink a yacht so he could recover insurance money. The court permitted the government to introduce evidence that the defendant had previously lost three insured sea vessels. *Id*. at 1219. This Court held that these prior acts were admissible because they were "necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *Id*. at 1220. The jury needed to hear evidence about the three prior losses to understand why the defendant could not obtain insurance under his own name in the current scheme. *Id*.

*DeGeorge* does not support the court's decision to admit the tugboat evidence. First, the prior acts in *DeGeorge* were acts by the party against whom the evidence was introduced. Here, plaintiffs had no connection to any of the acts about which Schools testified. Second, the three acts in *DeGeorge* occurred *before* the crime at issue, and were necessary for the prosecutor to tell a coherent

story about the commission of the crime.  By contrast, the taking of the tug *after* the attack occurred was not necessary for Chevron to present a coherent account of its actions during the Parabe incident.  None of the plaintiffs was involved in the taking of the tug; indeed, they were either dead, injured and in custody, or detained by the time the tug was taken.  Chevron did not need the tug incident to explain its decision to call in the GSF; by the time the tug was taken, that decision had already been made.  The mere fact that the tugboat incident occurred directly after the shootings, in reaction to them, was an insufficient reason to admit the evidence.  *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995) (holding that "coincidence in time" is an insufficient basis to admit "other act" evidence).

Making matters worse, the court did not simply permit evidence that villagers took the tug, but also permitted Schools to testify in detail about the events onshore from May 28 to May 31, including his fear for his life and his belief that he had dysentery.  Whereas the court in *DeGeorge* put "limitations on the evidence" of the prior acts, 380 F.3d at 1220, the court here failed to limit Schools' testimony.  *Cf. United States v. Curtin*, 489 F.3d 935, 958 (9th Cir. 2007) (court erred in failing to redact prejudicial "other act" evidence to ensure that only relevant evidence was admitted).  In short, Schools' extensive testimony about the taking of the tug and being held onshore was not necessary to tell a "coherent

story" about any issues before the jury, and its sole effect was to engender sympathy for the expatriate workers and antipathy towards the Ilaje protestors.

The district court's second rationale for admitting the tugboat incident was that it was relevant "to prove the intent of the Ilaje in approaching the barge." ER:79 (citing *United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991)).[2] Once again, the district court misapplied a decision by this Court.

In *Ayers*, the defendant was accused of tax evasion. The trial court admitted evidence that the defendant had engaged in three subsequent acts in which he attempted to conceal large amounts of cash from the government. This Court held that these subsequent acts were admissible under Fed. R. Evid. 404(b) to prove that the defendant intended to commit the crime at issue, reasoning: "[The defendant's] subsequent acts of concealing large amounts of cash are highly probative of an intent to defraud the United States in the collection of income taxes." *Id*. at 1473.

---

[2]The district court also stated that the tug evidence was relevant "to rebut plaintiffs' characterization of the interactions between the Ilajes and the tugboat crew." ER:79. However, plaintiffs introduced evidence in their case-in-chief of the tug events only because the court had denied their motion *in limine* to exclude the events, and only after defendants had described the events in their opening statement. Had the court granted plaintiffs' motion, plaintiffs never would have put on this evidence since it would not have been relevant to any of the issues put before the jury.

After the *Ayers* panel concluded that the subsequent acts fell within the scope of Rule 404(b), *id.*, it went on to analyze whether the district court had engaged in the balancing required under Rule 403. The Court found that the district court had done so, and had minimized the possible prejudice of the evidence by limiting the testimony and instructing the jury that the evidence was admitted solely to prove intent. *Id*.

Here, unlike *Ayers*, the subsequent taking of the tugboat crew does not tend to show the intent of plaintiffs, or any other protesters, in coming to Parabe. None of the plaintiffs was involved in tugboat incident, so the incident does not illuminate their motives. Even if the intent of protesters other than the plaintiffs were relevant to this case, Chevron introduced no evidence that, prior to the GSF attack, any of the protesters had planned to take the tug to shore. The taking of the tug occurred in response to an intervening event: the GSF's brutal attack on the Parabe protesters. Furthermore, as the Supreme Court has explained, it cannot be assumed that protestors intended to commit acts of violence simply because other members of the same protest subsequently acted violently. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).

Indeed, the evidence at trial showed that the handful of protesters on the tug decided to take it to shore only after learning of the attack, and that they held the crew only because the GSF had detained eleven protesters. ER:1581-87. The

GSF attack was an intervening act that severed any link between the protest and the decision to take the tug. *Accord United States v. Haywood*, 280 F.3d 715, 722 (6th Cir. 2002) ("When an act and a charged offense are so dissimilar that the act has no logical tendency to prove the intent element of the charged offense, no degree of temporal proximity will infuse the act with probative value."). Furthermore, in *Ayers*, 924 F.2d at 1473, the court told the jury that the subsequent acts were being admitted solely to prove intent. The district court provided no such limiting instruction here.

After determining that the subsequent acts fell within the scope of Rule 404(b), the *Ayers* court recited the rule that "[e]vidence of [the defendant's] subsequent acts to prove intent 'may be accepted only if, on balance, its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant.'" *Ayers*, 924 F.2d at 1474 (citing *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985)); *see also United States v. Nelson*, 137 F.3d 1094, 1107 (9th Cir. 1998). The court below engaged in no such balancing.

It is well established that a district court must make some record of having engaged in Rule 403 balancing. In *Blind-Doan*, the lower court excluded evidence of an "other act" of sexual assault in response to the defendant's *in limine* motion. The judge excluded the evidence in a "one-sentence order without findings or any explanation for his decision." *Blind-Doan*, 291 F.3d at 1082. This Court

reversed, holding that although "a trial judge allowing evidence under Rule 403 does not need to recite his balancing analysis," the record must make clear that the balancing was, in fact, done. *Id*. at 1083.

Here, the district court never engaged in Rule 403 balancing with respect to the tug incident. The court did not make a record of balancing during the hearing on plaintiffs' motion to exclude evidence of the incident, in its order denying that motion, in its order overruling plaintiffs' renewed objections, or in its order denying plaintiffs' motion for a new trial. ER:281, ER:3885-3941, ER:11, ER:79. Nothing in the record suggests that the district court engaged in the required Rule 403 balancing.

Even assuming that the district court implicitly balanced, the court erred in admitting the evidence because its relevance was substantially outweighed by its unfairly prejudicial nature. The ultimate questions before the jury were: whether the GSF were justified in shooting three of the plaintiffs and torturing a fourth; whether CNL acted negligently in deciding to send in the GSF; whether CNL was vicariously liable for the acts of the GSF; and whether the defendants were vicariously liable for the actions of CNL. *See* ER:15-71. Events that occurred subsequent to the attack had little, if any, conceivable relevance to these questions.

By contrast, the danger that Schools' testimony would prejudice the jury was great. Testimony that other Ilaje protesters kidnapped the tug crew is exactly

the type of evidence that would make the jury less likely to find in plaintiffs' favor because "it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude" towards a party, rather than providing insight into the ultimate questions to be decided in the case. *Hodges*, 770 F.2d at 1480 (testimony about defendant's subsequent "willingness to resort to illegal extortionate tactics" was unduly prejudicial because it was likely to cause the jury to disregard evidence about actual guilt or innocence).

Finally, the prejudicial nature of the tugboat evidence was compounded by defense counsel's use of the evidence in closing to argue that the Ilaje people as a whole had a propensity for violence. The law is clear that a party's other acts may not be used to show that a party "has a bad character," *Hodges*, 770 F.2d at 1479, or violent propensities, *United States v. Bracy*, 67 F.3d 1421, 1433 (9th Cir. 1995). The error is far worse when acts of *other nonparties* are used to show that an *entire ethnic group* is violent.

Nevertheless, in closing, defense counsel argued that the tugboat evidence demonstrated that kidnapping was "part of the mind set" of Ilajes – "It's something that they would do." ER:3162-63. Counsel used the evidence for the improper purpose of showing that the Ilaje had a propensity for kidnapping. Thus, even assuming that the court's initial ruling in admitting the evidence was correct, Chevron's actual use of the evidence was unduly prejudicial. *Cf. United States v.*

*Schemenauer*, 238 Fed. Appx. 248, 250 (9th Cir. 2007) (reversal required where the government's actual use of "other act" evidence exceeded the permissible purpose under Rule 404(b)). For all of these reasons, the district court erred in admitting evidence of the post-attack tug incident.

### 3. The District Court Erred in Admitting Photographs of Protesters Using A Machete to Butcher a Sea Turtle

Over plaintiffs' objections, the district court admitted photographs that Schools took of protesters on the tugboat – not the plaintiffs – using a large machete called a "lamb splitter" to butcher a sea turtle for food. ER:3653-56. The photographs show the protesters smiling and holding a bloody machete over a dead sea turtle.

Plaintiffs filed a pretrial motion to exclude the photos, arguing that they were irrelevant and prejudicial. The district court denied the motion without explanation. ER:27. Defense counsel showed the jury a sea turtle photograph during opening, suggesting that this photograph demonstrated that the protesters onboard the *barge* had knives. ER:578. Plaintiffs' counsel objected, and the court called a sidebar. Plaintiffs' counsel again objected that the photograph was prejudicial, but the court overruled the objection without explanation. ER:578-79. Defense counsel then told the jury that the photograph "shows one of the invaders with a knife, a long knife, called a lamb splitter, or maybe a machete in his hand.

It's being used to – on a sea turtle. It is an example of a weapon that they had access to." ER:579.

During trial, defendants introduced the photos through Schools, who testified that they depicted the "pirates" engaged in the "slaughtering of a sea turtle." ER:3453-55. Plaintiffs again objected, but the district court again overruled these objections without explanation. ER:3903-11.

During closing, defense counsel again argued that the photos showed that the protesters *on the barge* had access to knives, "[a]nd this is the kind of thing that would make a worker afraid." ER:3156-57. Counsel made this argument even though the photographs were taken on the tug, and none of the workers on the barge testified that they knew that the protesters on the tug had knives, let alone that they were afraid as a result.

The district court erred in admitting the sea turtle photographs. This evidence was irrelevant to the questions that the jury decided because Chevron introduced no evidence that Davis or the other decisionmakers relied on it when deciding whether to ask the GSF for assistance. The photo was taken on the tugboat, not the barge. Davis did not testify to any violence or weapons on the tug that caused him to reach the decision. ER:2728-75. Davis and the crisis management team were not in touch with the tugboat during the incident; the only contact the team had with the tug was a radio call to the mechanic to ask him to

disable the engine.  ER:2242-43.  It is undisputed that Davis was unaware of the sea turtle butchering and there is no evidence that any of the workers on the barge knew about it.  In any event, there was no evidence that the lamb splitter was used to threaten, much less attack; it was used to prepare food.  For these reasons, the photos were irrelevant and should not have been admitted.  Fed. R. Evid. 402.

Even if the photos were at all relevant, any marginal relevance was greatly outweighed by their prejudicial effect.  In *United States v. Hitt*, 981 F.2d 422 (9th Cir. 1992), the defendant was charged with possessing an unregistered rifle.  At trial, the government was permitted to introduce a photograph depicting the rifle along with a dozen other weapons (guns and knives) that belonged to the defendant's housemate.  The Ninth Circuit held that the photograph should have been excluded under Rule 403 because of its potential to prejudice and mislead the jury.  *Id*. at 424.  The Court reasoned that the jury likely assumed that all of the weapons belonged to the defendant, and "might well have concluded [the defendant] was the sort of person who'd illegally own a machine gun, or was so dangerous he should be locked up regardless of whether or not he committed this offense.  Rightly or wrongly, many people view weapons, especially guns, with fear and distrust."  *Id*.  The Court held that this error warranted a new trial.  *Id*. at 425.

As in *Hitt*, the photographs here likely provoked an emotional response because they show protesters wielding a bloody machete next to a dead sea turtle. These images convey that the Ilaje people are violent, even though they were simply preparing a meal. The photos also likely provoked a negative emotional response because Americans typically view sea turtles as animals to be protected, not eaten. This was precisely the effect desired by Chevron's attorney when she asked Schools: "[D]id they cut the turtle's head off while you were watching them on May 25, 1998?" ER:3454.

Further, as with the post-tug events, the district court erred in failing to engage in any Rule 403 balancing with respect to the photographs. *Blind-Doan*, 291 F.3d at 1083. The court did not explain why the photos were relevant. Even assuming that the court implicitly balanced, it was error to admit the photographs because their unfair prejudicial effect substantially outweighed any minimal relevance.

### 4. The District Court Erred in Admitting Prejudicial Multiple-Level Hearsay Statements From Two Individuals Not on the Barge

Over plaintiffs' objections, the district court admitted testimony from John Stapleton and Randall Hervey, two CNL employees who were not at Parabe during the incident. Their testimony consisted primarily of multiple-level hearsay statements regarding what they had heard about the protesters' conduct. For

example, Hervey and Stapleton testified that they heard from others that the protesters were chanting; shoving and hitting workers; saying they were going to set the barge on fire; and putting out lit matches with their fingers near diesel fuel they had poured on the barge. ER:2356, ER:2901, ER:3495-96, ER:3499, ER:3501. Stapleton testified that he heard that the protesters were smoking marijuana; breaking bottles and "screaming lots of things in native dialogue." ER:3496, ER:3498. Stapleton further testified that he received "distress calls" from unidentified workers, who said things like, "Call my family, tell them that I love them." ER:3500.

In its order denying plaintiffs' motion for a new trial, the court stated that it admitted the Hervey/Stapleton testimony because both men testified that they provided the information to the crisis management team, and, accordingly, the testimony was admissible "not to prove that these events occurred but because it was probative of the crisis management team's information about the situation that was unfolding on the barge." ER:80. The court reasoned that the information was "relevant to a central issue in the case: whether CNL was justified in seeking the assistance of the GSF." *Id*.

The district court erred in admitting this testimony for two reasons: first, it was irrelevant for any nonhearsay purpose, and second, the court failed to conduct

a Rule 403 balancing analysis despite plaintiffs' objections that the evidence was prejudicial.

Although an out-of-court statement is not hearsay if it is offered for some purpose other than to prove the truth of the matter asserted, Fed. R. Evid. 801(c), the district court erred in concluding that there was a permissible nonhearsay purpose for admitting these statements. Here, the only nonhearsay purpose that the court identified was to show the information that the crisis management team had when it decided to send in the military, but this holding is not supported by the record.

The court's focus on the crisis management team was misplaced because Davis had already testified at trial that *he* made the decision to send in the military, and he had explained his reasons for doing so. He had not mentioned either Hervey or Stapleton, much less testified that they had provided any information on which he based his decision. In addition, neither Hervey nor Stapleton was involved in the decision to request assistance from the military.

Furthermore, the district court was incorrect in concluding that Hervey and Stapleton testified that they provided all of the information to which they testified to the crisis management team. Stapleton was not a member of the team and never testified that he relayed information to them. Rather, he provided only one piece

of information directly to Davis[3] and provided the remainder only to Hervey. ER:3495; ER:3497-3501.

Hervey, in turn, never identified which of this information, if any, he conveyed to the crisis management team. Hervey testified only that three individuals, including Stapleton, provided him with information that the workers "were scared because there were threats of violence." ER:2883. Hervey further testified that "[t]here were reports that my people on the platform, that they were shoved, that they were hit," but did not identify Stapleton as the source of this information. *Id*. Beyond this, Hervey did not confirm that he passed along any of Stapleton's information to the crisis management team. Without this "missing link," there was no support for the district court's supposition that the information to which Stapleton testified was passed to the crisis management team.

Significantly, Davis did not testify that either Hervey or Stapleton relayed information to him. Instead, Davis identified Dave Parkin as his sole source of information from the barge. ER:2750-51, ER:2752, ER:2754, ER:2756-57, ER:2233, ER:2768, ER:2816, ER:2819. Davis's log does not refer to Hervey or Stapleton. ER:3609-11. Further, Davis testified that Hervey was on the crisis management team only on May 25 and that he left on May 26 for days off.

---

[3] The only information Stapleton provided to Davis was a worker's request to contact his wife. ER:3501.

ER:2796.   For these reasons, the court's finding that the events to which Hervey

and Stapleton testified were relayed to the crisis management team is unsupported

by the record.   The testimony was therefore irrelevant for any nonhearsay purpose.

The district court also erred in admitting the testimony because it was

unduly prejudicial, and the court made no record of 403 balancing.   The testimony

should have been excluded under Rule 403 because it would bolster the

impression that the plaintiffs and other protesters were doing bad things and

deserved to be shot, beaten and tortured.   Furthermore, the testimony was

inherently unreliable because it was multiple-level hearsay and Hervey and

Stapleton frequently could not identify the sources of their information.[4]  *See*

*United States v. Fernandez*, 892 F.2d 976, 984 (11th Cir. 1989) ("[E]xperience

suggests an inverse relationship between the reliability of a statement and the

number of hearsay layers it contains.").

Although the court gave a limiting instruction that jury was to consider the

statements only as evidence of "demonstrating what this witness told to other

people at Chevron who may have been in a position to make decisions," ER:2876-

77, no instruction could cure the prejudice created by the hearsay testimony that

---

[4] Hervey testified that most of his information came from one of three
people, but he was unsure who told him what.  ER:2883:18-20, ER:2888:16-17,
ER:2889:18-25, ER:2890:7-2891:4; *see also* ER:3500-01 (Stapleton was given
information by four or five unidentified workers).

the Ilajes had engaged in violent acts and threatened to blow up the barge. *Cf.*

*United States v. Bland*, 908 F.2d 471, 473 (9th Cir. 1990) (limiting instruction

insufficient); *United States v. Brown*, 767 F.2d 1078, 1084 (4th Cir. 1985).

Indeed, this instruction compounded the prejudice by suggesting that Hervey and

Stapleton had in fact told Davis all the hearsay they recounted at trial.

Even though plaintiffs raised these arguments below, the court failed to

make any record of 403 balancing when it admitted the testimony, or in its order

denying plaintiffs' motion for a new trial. ER:2859-63, ER:79-80. The district

court's failure to balance constituted error, as did its decision to admit the

testimony. *Blind-Doan*, 291 F.3d at 1082.

### 5. The District Court Erred in Admitting Evidence of Four Prior Kidnappings

Over plaintiffs' objections, Chevron introduced evidence of four unrelated

kidnappings allegedly committed by Ilajes other than the plaintiffs in 1996 and

1997. CNL's Deji Haastrup, who negotiated with the elders during the Parabe

incident, testified about the kidnappings. He testified that one of the kidnap

victims was "totally distraught" when he was released, and that he "couldn't stop

crying. . . . You know, he was just broken. He had mosquito bites all over his

body, and he said, I'm going home, I will never return to this country." ER:2409-

2414.

The district court stated that it admitted this evidence solely to show Haastrup's state of mind when he was negotiating with the elders, not to show that the kidnappings had actually occurred. ER:2355 (kidnappings "may go to [Haastrup's] state of mind and he may testify about that"); 2411 (kidnap victim's condition relevant to show "[i]mpact on this witness"); 2412-13 (otherwise hearsay testimony about the kidnappings admitted "to explain what Mr. Haastrup heard and what he understood for his state of mind"); *see also* ER:2415; ER:80 (order denying new trial confirms that kidnapping evidence was not admitted for its truth).

In closing argument, however, defense counsel went beyond the district court's limitations on the kidnapping evidence, arguing that these kidnappings and the tugboat kidnapping showed that the plaintiffs, because of their Ilaje ethnicity, had a propensity to engage in kidnapping and that the Ilaje protesters had, in fact, kidnapped people both before and during the Parabe incident:

> [Y]ou heard Captain Schools' description of what it was like on the three days, first three days, and you heard his description of what it was like to be hijacked and taken hostage to the village, and held there for another three days.
>
> Now, why is all this significant? I think for several reasons. First of all, it shows that hostage-taking, kidnapping, *was part of their mind set. It's something that they would do.* It's something they, these Ilaje communities, some people in the Ilaje communities, *had done at least four times before. It's what they were doing at Parabe, and it's what they did on the tug afterwards.*

ER:3162-63 (emphasis added).

The district court erred in permitting Haastrup to testify about the kidnappings, an error that was compounded by counsel's misuse of the evidence in closing. The court admitted this evidence on the theory that it went to Haastrup's state of mind while he was negotiating with the Ilaje. However, Haastrup's state of mind during the negotiations was irrelevant because he was not involved in the decision to call in the military. Instead, the decision was made by Davis with approval from Schull and Kirkland. ER:1389-91; ER:2764-66. Chevron introduced no evidence that the prior alleged kidnappings had anything to do with the decision to send in the military. For these reasons, evidence of the prior kidnappings was irrelevant, and should not have been admitted. Fed. R. Evid. 402.

The district court also erred in overruling plaintiffs' Rule 403 objection that the relevance of the kidnapping evidence was substantially outweighed by its unfairly prejudicial effect. The potential for the jury to engage in an impermissible "group character evidence" assumption based on the kidnapping evidence was high: if the Ilaje ethnic group engaged in kidnappings on four previous occasions, surely it was the intend of plaintiffs and the other Ilaje protesters during the Parabe protest to similarly kidnap people and take hostages.

This is precisely the type of evidence that should be excluded under Rule 403.

### 6. The District Court's Erroneous Evidentiary Rulings Prejudiced Plaintiffs

The district court's errors in admitting these four categories of evidence was prejudicial because Chevron cannot show that it that it is "more probable than not that the erroneous admission of the evidence did not affect the jury's verdict." *Vizcarra-Martinez*, 66 F.3d at 1017; *Blind-Doan*, 291 F.3d at 1082.

Chevron relied extensively on the improperly admitted evidence throughout the trial to generate sympathy towards the workers and vilify the plaintiffs and other protesters based on their Ilaje status. As noted above, defense counsel showed a photo of tugboat captain Schools during his opening statement; he talked about whether the "crew would ever get out alive" and later revisited the Ilaje "hijack[ing]" the tugboat. ER:568, ER:584. Also, as detailed above, defense counsel suggested to the jury in both his opening statement and his closing argument that the sea turtle photographs demonstrated that the protestors "had knives" or "had access to" weapons such as the machete, ER:578-79, or "had access to knives." ER:3155. Indeed, defense counsel emphasized in closing that "these are important photographs." ER:3156.

Defense counsel also argued in closing that the Ilaje community had made it "difficult" to discuss their concerns before the Parabe protest because "they

engaged in kidnapping and hostage-taking." He reminded the jury that Haastrup had testified to four kidnappings, two in 1996 and two in 1997. ER:3144; *see also* ER:3145-46 (defense counsel refers again to the previous kidnappings).

Defense counsel read from Schools' testimony describing some Ilaje protesters "scrambling" onto the tug after the attack and surrounding him, "and you heard his description of what it was like to be hijacked and taken hostage to the village." ER:3162. Defense counsel then capitalized on the improperly admitted tug and prior kidnapping evidence to argue that the evidence "shows that hostage-taking, kidnapping, was part of their mind set. It's something that they would do. It's something they, these Ilaje communities, some people in the Ilaje communities, had done at least four times before. It's what they were doing at Parabe, and it's what they did on the tug afterwards." ER:3162-63.

Defense counsel also reminded the jury about Stapleton's hearsay statements: "And [Stapleton] said he received distress calls. Calls from people on the barge, saying, 'Call my Congressman,' 'Call my wife,' 'Call my family, tell them that I love them.'" Even though the district court purportedly limited Stapleton's testimony to show the information possessed by the crisis management team, defense counsel used the Stapleton testimony elicit sympathy and to argue the truth of what it asserted: "Those are the words of people who are scared because they are being held hostage." ER:3158.

Chevron's heavy reliance upon this improperly-admitted evidence makes it likely that the jury returned a verdict in Chevron's favor based not on the evidence relevant to the ultimate questions before it, but based on testimony that Ilajes in general engaged in "other acts" of violence. Chevron's reliance on this evidence also likely infected the jury with antipathy towards the plaintiffs and sympathy towards the workers like Schools. Under these circumstances, it was more likely than not that the improperly-admitted evidence affected the jury's verdict. Accordingly, this Court should grant a new trial.

The prejudicial nature of the erroneous evidentiary rulings also is demonstrated by the fact that liability was warranted here based on uncontroverted evidence. For example, the evidence was undisputed that Jeje and Bowoto were not resisting when they were shot and when Jeje was beaten, and that Oyinbo was repeatedly tortured while in custody. The GSF were only "entitled to use force as may be reasonably necessary to overcome any force used in *resisting* arrest." ER:63 (emphasis added).

The evidence was similarly undisputed with respect to at least two theories by which plaintiffs sought to hold CNL responsible for the GSF's acts: agency and joint enterprise. Since these are *vicarious* liability theories, CNL is responsible even assuming the jury could properly have found CNL was justified in calling in the GSF. Responsibility is based not on fault, but rather on CNL's relationship

with the GSF.

Regarding agency, as the above Statement of Facts demonstrates, largely uncontroverted evidence showed that CNL controlled the timing and manner of the military operation at Parabe; directed the GSF's actions there; routinely paid, fed and housed the GSF, including paying them for the services rendered at Parabe, and routinely transported the GSF, including in the helicopters used in the Parabe operation and the boats used to transport the detained Ilajes from Escravos to Warri.[5]  ER:53-64 (agency jury instruction).  Regarding joint enterprise, it was uncontroverted that CNL was engaged in concerted action with the GSF with a common end (which need not be wrongful or illegal).  ER:57.

Strong, undisputed evidence also showed that CNL was defendants' agent. ER:45-47 (jury instruction).  Defendants exercised control over virtually every aspect of CNL, including its security operations.  Defendants set CNL's policies, including security policies.  Defendants regularly communicated with CNL regarding security incidents, including during Parabe.  CNL was hugely important to defendants' overall operations.  There was substantial overlap between defendants' officers, directors and managers and CNL's.  Personnel regularly rotated between defendants and CNL.

_____

[5]This is equally true of the abuses committed against Oyinbo at Escravos and Warri, since they were committed by the same soldiers, engaged in a continuous course of conduct on CNL's behalf.

In sum, plaintiffs presented a clear path to defendants' liability based on essentially uncontested evidence. Indeed, at trial, defendants' strategy was to prove, through the erroneously admitted evidence, that the decision to send the GSF to the barge, and the GSF's use of force against *other* protesters on the barge, were justified. Yet, even if accepted by the jury, this is simply not a legal defense to the plaintiffs' claims. Thus, there is no question that the erroneous admission of that evidence likely affected the jury's verdict.

## B. The District Court's Jury Instructions Misstated the Law on Plaintiffs' Assault and Battery Claims and Used Misleading Language on Chevron's Supposed Law Enforcement Reporting Privilege

### 1. Standard of Review

"Whether a jury instruction misstates the elements that must be proved at trial is a question of law that is reviewed de novo." *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992). "A district court's interpretation of state law is reviewed under the same independent de novo standard as are questions of federal law." *Oviatt v. Pearce*, 954 F.2d 1470, 1479 (9th Cir. 1992).

"An error in instructing the jury in a civil case requires reversal unless the error is more probably then not harmless." *Caballero*, 956 F.2d at 206. "In reviewing a civil jury instruction for harmless error, the prevailing party is not entitled to have disputed factual questions resolved in his favor because the jury's

verdict may have resulted from a misapprehension of law rather than from factual determinations in favor of the prevailing party." *Id.* at 207. Further, this Court is required to "presume prejudice where civil trial error is concerned and the burden shifts to the [defendant] to demonstrate 'that it is more probable than not that the jury would have reached the same verdict' had it been properly instructed." *Dang v. Cross,* 422 F.3d 800, 811 (9th Cir. 2005).

### 2. The Assault and Battery Jury Instructions Do Not Reflect Applicable Law

In a 2007 pretrial order, the district court held, at Chevron's urging, that Nigerian law governed plaintiffs' claims for injuries sustained on the barge and platform, and that plaintiffs had to prove these claims beyond a reasonable doubt, as required by Nigerian law (hereafter, "the Nigerian-law claims"). ER:230 ER:3021-22, ER:4270-71, ER:4120-21. The court further ruled that under Nigerian law, defendants had the burden to prove all affirmative defenses beyond a reasonable doubt, including self-defense, reasonable use of force, and suppression of a riot or unlawful assembly. ER:234-35. With respect to the injuries Oyinbo sustained on land when he was tortured, the court held that California law governed (hereafter, "the California-law claims"). ER:93-98.

Two years later, in fashioning the assault and battery jury instructions under both California and Nigerian law, the court held that *plaintiffs* had to prove that

the GSF used unreasonable force as an element of their claims, and relieved the defendants of their burden to prove any affirmative defenses, including that the GSF's use of force was reasonable. ER:30-34, 61-63. These instructions were contrary to the law and to the court's own pretrial rulings.

> ### a. The District Court Improperly Required Plaintiffs to Prove that the GSF Used Unreasonable Force And Removed Defendants' Burden to Prove their Affirmative Defenses

In its 2006 summary judgment papers, Chevron and its Nigerian law expert conceded that a battery under Nigerian law is simply "the intentional application of force to another person" and that self-defense, the reasonable use of force, and other legal justifications are defenses that a defendant must prove. ER:4272-73, ER:4119, ER:4121-27. More than two years later, Chevron shifted to its current position that proof of unreasonable force is an element of the claim of battery where the defendant is a police officer. While such a rule may apply in some situations under California law, nothing in Nigerian law supports the district court's decision to require plaintiffs to prove as an element of their claims that the GSF used unreasonable force.

In fact, this question was settled in *Ashley v. The Chief Constable of Sussex*

*Police* [2006] EWCA Cal. 1085 (July 27, 2006),[1] an English case that is

persuasive authority in Nigeria.[2]  There, the English appellate court held that a

civil plaintiff suing for battery by a police officer need not establish that the

officer used unlawful force in causing injury as part of its case:  "[T]he burden of

proving self-defense, including the allegation that the force used was reasonable,

is on the defendant."  *Id.* at ¶¶ 20, 23; *see generally* ¶¶ 22-28.

Chevron has never identified any Nigerian statute or other authority

imposing on civil battery plaintiffs the burden of proving unreasonable force.

Still, the district court instructed the jury that, as part of their Nigerian-law claims,

each plaintiff must prove that "the Nigerian security forces used unreasonable

force against him."  ER:32.  This was a clear error of law and gives rise to a

presumption of prejudice that Chevron has the burden of rebutting.  *Clem v.

Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009).

Moreover, the error is extremely prejudicial because the jury could have

easily found the other elements of battery, while the question of whether

reasonable force was used was hotly contested.  *Caballero*, 956 F.2d at 207

(instructional error of adding element to plaintiff's burden was not harmless

---

[1] *Ashley* can be found in the concurrently-filed Appendix of Foreign Authority.

[2] Except where superseded by Nigerian law, the common law of England has legal force in Nigeria.  *See* ER:4116, and sources cited therein, ER:4170-4195.

because "[a] jury could easily find the elements necessary to establish liability for false arrest but not find the specific intent to violate constitutional rights."). This error requires a new trial on plaintiffs' Nigerian-law battery claims, including the Irowarinun wrongful death claim which was based in part on a battery theory.

> **b.** **The District Court Improperly Instructed the Jury on Unreasonable Force for the California-Law Battery Claim**

The district court used a single instruction for the elements of plaintiffs' battery claims under both Nigerian and California law, declaring that, for all such claims, plaintiffs had to prove the use of unreasonable force as part of their case. As noted above, this was clearly erroneous under Nigerian law. Similarly, under California law, this instruction was error. The California-law claims for Oyinbo's torture by the GSF while he was in custody should not include an "unreasonable force" element both because the battery occurred after Oyinbo was already in custody, not during arrest, and because the GSF were acting as a private security force for Chevron, not simply as police officers.

In *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998), the appellate court added a new unreasonable-force element to battery claims against police officers using force "to make an arrest, prevent escape or overcome resistance." The narrow applicability of this unreasonable-force element is

reflected in CACI No. 1305 and cases applying the exception, which limit it to arrests, escapes, and acts of resistance. *E.g., Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526-28 (2009); *Munoz v. City of Union City,* 120 Cal. App. 4th 1077, 1101-03 (2004).

Oyinbo was taken into custody on the barge and there was no evidence at trial that he later tried to escape or resisted the GSF. The beatings and torture on which his battery claim is based began long after he was in custody, and continued over a course of weeks. Thus, under California law, the Oyinbo family is not required to prove unreasonable force as an element of their battery claim and the jury should not have been so instructed. *Clem*, 566 F.3d at 1181 (party is entitled to a jury instruction framing its theory of the case only if supported by the law and grounded in the evidence).

Plaintiffs also did not have to prove unreasonable force because the evidence showed that the GSF were acting in their roles as Chevron's private security guards, not police officers. Under California law, it is improper to apply tort standards used for a peace officer defendant where the defendant was acting within the course and scope of his private employment as a security guard. *Cervantez v. J.C. Penney Co., Inc.*, 24 Cal.3d 579, 587-89 (1979) (jury instruction applicable only to peace officers prejudiced plaintiff where defendant officer was employed as private security guard); *Traver v. Meshriy*, 627 F.2d 934, 940 (9th

Cir. 1980) (applying California law to reject privately employed police officer's claim to special "peace officer" instructions ).

Given the evidence here of Chevron's regular supervision, control and compensation of the GSF, the district court should not have added the "unreasonable force" element to Oyinbo's battery claim without also instructing that this element would *not* apply if the jury found that the GSF were acting as Chevron's private security forces in torturing Oyinbo. *Clem*, 566 F.3d at 1181 (instructions should reflect each party's theory of the case). Because the court's instruction failed to make this distinction, it was prejudicially incomplete and misleading and contrary to the law. *Norwood v. Vance*, 572 F.3d 626, 629-30 (9th Cir. 2009); *Dang*, 422 F.3d at 806. This error requires a retrial of the California-law battery claims.

### c. The District Court Erroneously Removed the Affirmative Defense Instructions

In fashioning jury instructions, the district court inexplicably overturned its own pretrial ruling that Chevron had the burden to prove, as a defense to battery, that the GSF were using self-defense when they shot the plaintiffs, or that the GSF were suppressing a riot. ER:234-35. While the district court instructed that Chevron bore the burden of proving "any affirmative defense . . . assert[ed] against these [assault and battery] claims" beyond a reasonable doubt if the

defense required proof of commission of a crime, the district court did not give any affirmative defense instructions with respect to battery. This not only resulted in error but likely confused the jury.

Instead of providing affirmative defense instructions, the district court included a section called, "Privileges, Duties and Defenses," which was described, not as containing defenses to the assault and battery claims, but as guidance for the jury's assessment of "whether CNL was negligent when it called in and assisted the Nigerian security forces." ER:61. The instructions in this section focus on a citizen's privileges and duties to aid law enforcement, an employer's duty to provide a safe work environment, five crimes that Chevron contended the plaintiffs had committed, and an instruction on the GSF's legal entitlement to use force to overcome any force used in resisting arrest.

These instructions fail to provide any clue that they involve affirmative defenses that had to be demonstrated by Chevron. Because of the district court's erroneous instruction imposing on plaintiffs the burden of proving unreasonable force, however, the clear impression from these instructions was that plaintiffs had to negate all the criminal accusations and claims they were resisting arrest, while at the same time proving that the GSF had used greater force than they were entitled to inflict.

The district court erred in giving these vague and misleading instructions and in failing to provide plaintiffs' proposed instructions on each affirmative defense Chevron asserted. Under California law, self-defense, defense of others, and the use of unreasonable force are affirmative defenses, except in the narrow situation where a California peace officer is effectuating an arrest or detention. *Carlson v. Wald*, 151 Cal. App. 3d 598, 602 (1984); *Boyer v. Waples*, 206 Cal. App. 2d 725, 727 (1962). Nigerian law is clear that self-defense, use of reasonable force and the right to suppress a riot are affirmative defenses that the defendant must establish. *Ashley v. The Chief Constable of Sussex Police,* at ¶¶ 20, 23; Nigerian Force Order No. 237 (ER:4196); Nigerian Evidence Act § 141(1) (ER:4275-78). Further, for plaintiffs' Nigerian-law claims, with respect to any defense that plaintiffs or anyone else engaged in crimes, Chevron would have had to prove those crimes beyond a reasonable doubt. Nigerian Evidence Act § 138(1) (ER:4277).

In light of Chevron's efforts to argue that the GSF shot plaintiffs in self-defense, that plaintiffs and others were resisting arrest or engaged in a riot, and other theories involving affirmative defenses, *e.g.*, ER:3135, ER:3177, ER:3184, ER:3186, the district court plainly erred in failing to provide clear instructions on Chevron's burden to prove these affirmative defenses. As with the other instructional errors, this mistake gives rise to a presumption of prejudice that

Chevron cannot rebut.

### 3. The District Court's Instructions on Crime Reporting Duties and Privileges Are Inapplicable and Incomplete

The district court's instructions about Chevron's supposed "privileges, duties and defenses" contained numerous prejudicial errors of law. First, because the "law enforcement reporting privilege" derives from California statutory law and there is no authority making this privilege applicable to plaintiffs' Nigerian claims, it was error for the district court to instruct the jury that such a privilege would be a defense to plaintiffs' Nigerian negligence claims. ER:61. This error alone requires reversal of these claims. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 30 (1962) (reversing general verdict that might have rested upon an erroneous theory of liability).

Second, contrary to the "Duty to Report Crime" instruction, Nigerian law does not immunize a private actor from injuries caused in reporting criminal activity or assisting law enforcement in "preventing crime and apprehending perpetrators." ER:61. On the contrary, a private actor may be held liable for the torts of the police where the actor plays a direct role in the commission of the tort. ER:4282-83; *Ezeadukwa v. Maduka*, (1997) 8 NWLR 635 (ER:4249-68) (holding that a defendant who actively participates in setting the police against another may be liable for the resulting tort). It was error for the district court to instruct the

jury otherwise.

Third, if it is applicable at all, the law enforcement reporting privilege is an affirmative defense that Chevron had to prove. *Tiedemann v. Superior Court*, 83 Cal. App. 3d 918, 922 (1978). Yet the district court instructed that Chevron had to prove only the existence of "adequate procedural safeguards" or "good faith," while failing to instruct that Chevron must also prove that it "reasonably believed that plaintiffs were committing [a] crime" or that it "report[ed] suspected criminal activity . . . to instigate law enforcement personnel to respond," while instructing that Chevron had the burden of proving the existence of "adequate procedural safeguards" or "good faith." ER:61. The court's identification of only some elements as ones that Chevron must prove wrongly implied that plaintiffs had to prove the remainder. These instructional errors require reversal.

## C. The District Court Erred in Dismissing the Irowarinun Family's Claims for Violations of International Law

### 1. Standard of Review

The district court dismissed the Irowarinun family's Torture Victim Protection Act claims on a motion to dismiss, and dismissed their Alien Tort Statute claims on a motion for summary judgment and a motion to dismiss; all are reviewed *de novo*. *Doe v. Abbott Labs.*, 571 F.3d 930, 933 (9th Cir. 2009). Erroneous dismissal of a claim before trial requires a new trial on that claim.

*Hansen v. White*, 947 F.2d 1378, 1379 (9th Cir. 1991).

## 2. The District Court Erred in Finding ATS Claims Superseded by the Death on the High Seas Act

The district court ruled that, because Irowarinun's death occurred on a barge offshore, it was covered by DOHSA, 46 U.S.C. §§ 30301-30308. ER:90-91. The court later ruled that DOHSA supersedes all ATS claims. ER:184-86 (extrajudicial killing), ER:205 (survival claims). The court erred in ruling that DOHSA supersedes Irowarinun's ATS claims.

### a. DOHSA Does Not Supersede ATS Claims for Death

The district court held that DOHSA essentially supersedes *all* other claims for death at sea, under "state statute, state common law, and federal statute." ER:184-86. This holding is unsupported by any language in DOHSA or legislative history. Congress passed DOHSA primarily to address the "absence of any remedy for wrongful death on the high seas" at the time. *Moragne v. States Marine Lines*, 398 U.S. 375, 397 (1970). Two categories of claims have been precluded by DOHSA. First, because Congress intended to make "a uniform provision for recovery for wrongful deaths on the high seas," DOHSA preempts state wrongful death laws. *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 233 (1986). Second, because Congress intended to prescribe its own "judgment" on certain elements of that recovery, such as "the beneficiaries, the limitations

period, contributory negligence, survival, and damages," DOHSA precludes courts from creating nonstatutory maritime claims to "supplement" DOHSA's remedies. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978).

But there is no evidence of, and no textual support for, Congressional intent for DOHSA to supersede other available federal remedies, as opposed to prescribing the features of a general federal maritime wrongful death claim. Indeed, the Supreme Court has recognized that the Jones Act provides an overlapping federal claim for the deaths of seamen. *E.g.*, *Moragne*, 398 U.S. at 400-01. The district court's holding that DOHSA superseded claims enabled by "federal statute" was based on a misreading of *Tallentire*, which held only that the plaintiffs there could not benefit from a death remedy in the Outer Continental Shelf Lands Act, 46 U.S.C. § 1331-1356a, because that statute did not apply to injuries on the high seas, not because DOHSA superseded it. *Tallentire*, 477 U.S. at 220.

ATS claims, which are enabled by a statute intended to have immediate effect, *see Sosa*, 542 U.S. at 724, should be considered "statutory" for preemption purposes. Thus, both DOHSA and the ATS should be given effect unless there is a "clear and manifest" intent to displace the ATS. *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). But DOHSA was intended only to provide "a cause of action . . . 'in cases where there is now no remedy.'" *Moragne*, 398 U.S. at 397

(quoting 59 Cong. Rec. 4486). When DOHSA was passed, at least two ATS claims were already available for deaths at sea – piracy and breaches of neutrality. *See Sosa*, 542 U.S. at 720, 732; Breach of Neutrality, 1 Op. Att'y Gen. 57 (1795). Even if ATS claims are considered "common-law" claims (a category that only applies when Congress "has not spoken to" the issue, *Milwaukee v. Illinois*, 451 U.S. 304, 313 (1981)), ATS claims can only be superseded if it "is evident" that Congress had a "statutory purpose" to alter the common-law remedy. *United States v. Texas*, 507 U.S. 529, 534 (1993) (internal quotation marks omitted). No such purpose is evident.

Allowing other federal claims, such as ATS claims, to overlap with DOHSA does not infringe on any of Congress's purposes in passing the law. It does not threaten uniformity, because ATS remedies are uniformly available, and it does not change the remedies available under the federal maritime wrongful death provision.

While DOHSA was intended to prescribe the rules for a *general maritime* wrongful death remedy, ATS offenses, as the *Sosa* Court explained, fall into a different "sphere" from admiralty. 542 U.S. at 715. Indeed, while the ATS was passed under authority of the "arising under" provision of Article III, Section 2, *id.* at 732, admiralty cases "do[] not, in fact, arise under the Constitution or laws of the United States." *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 545 (1828).

Nothing in DOHSA's text or history provides a basis for superseding other remedies enabled by federal statute, such as ATS claims.

### b. DOHSA Does Not Supersede ATS Survival Claims

The district court ruled that DOHSA also superseded survival claims for Irowarinun's injuries before death, citing the Fifth Circuit's ruling in *Jacobs v. Northern King Shipping Co., Ltd.*, 180 F.3d 713, 717 (5th Cir. 1999), that DOHSA preempts state survival actions for deaths at sea. ER:205. But *Jacobs* and the court's order both fail to discuss *Dugas v. National Aircraft Corp.*, 438 F.2d 1386, 1391 (3d Cir. 1971), in which the Third Circuit came to the opposite conclusion, as well as *Kernan v. American Dredging Co.*, 355 U.S. 426 (1958), in which the Supreme Court stated: "Presumably any claims . . . for damages accrued prior to the decedent's death would survive, at least if a pertinent state statute is effective to bring about a survival of the seaman's right." *Id.* at 430 n.4. In light of *Kernan*, it seems clear that *Dugas* was properly decided and *Jacobs* was not. Regardless, *Jacobs* held only that state survival actions were preempted by DOHSA, not that federal survival actions under a different grant of authority are superseded.

The district court also cited *Dooley v. Korean Air Lines Co., Ltd.*, 524 U.S. 116 (1998), in which the Supreme Court held that DOHSA prohibited the courts from creating a nonstatutory maritime law survival action. *Id.* at 124. But *Dooley* did not suggest that DOHSA supersedes all federal survival actions. Indeed, it

recognized that Congress had incorporated a survival provision in the Jones Act. *Id.* Thus *Dooley*'s holding that there is no "general maritime survival action," *id.*, even if it could be extended to apply to state law survival claims, should not be extended to independently actionable federal survival claims, such as those under the Jones Act or the ATS. As with claims for extrajudicial killing, there is no evidence that Congress intended DOHSA to supersede other federal remedies.

### 3.    The District Court Erroneously Ruled that the TVPA Does Not Apply to Corporations

The district court ruled that the TVPA does not apply to corporations, and dismissed plaintiffs' TVPA claims. ER:126-28. This was error.

The TVPA creates liability for an "individual who . . . subjects another individual to torture or extrajudicial killing." 28 U.S.C. § 1350 note. District courts are divided on the question of the TVPA's applicability to corporations; the only Court of Appeals to have considered the question, the Eleventh Circuit, has determined that the TVPA "allows suits against corporate defendants." *Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008). The district court's own analysis here, however, was faulty in several respects.

The court acknowledged the absence of any evidence that Congress intended to exclude corporations, ER:127, as well as caselaw establishing that "individual" can include corporations, *id.* (citing *United States v. Middleton,* 231

F.3d 1207, 1210 (9th Cir. 2000)), but then referred peremptorily to the Dictionary Act, 1 U.S.C. § 1, for the proposition that "Congress generally uses the term 'individual' in a manner that excludes corporations." ER:128. This ignores *Middleton*'s statement that the word "individual" "does not necessarily exclude corporations," 231 F.3d at 1210; its analysis that the Dictionary Act does not control if the context indicates otherwise, *id.;* and its direction that courts should avoid, when possible, interpretations that would produce an "absurd and unjust result which Congress could not have intended." *Id.*; *see also Clinton v. New York*, 524 U.S. 417, 429 (1998).

The district court failed to consider whether the context of the TVPA indicates that "individual" should include corporations, or whether excluding corporations would produce an absurd result. In fact, the legislative record makes clear that the term "individual" was chosen instead of "person" to exclude foreign governments, not corporations, from suit. S. Rep. No. 102-249 (1991), 1991 WL 258662, at *6. The TVPA was intended to *enhance* the remedies already provided in the ATS by extending the remedy to U.S. citizens as well as aliens. *Id.*, at *5. As the district court here recognized, "corporations may be held liable under the ATS." *Bowoto v. Chevron Corp.*, 2006 U.S. Dist. LEXIS 63209, *37 (N.D. Cal. Aug. 22, 2006). Nothing in the TVPA's legislative history suggests that it was meant to limit a remedy available under the ATS.

Finally, limiting applicability of the TVPA to natural persons would frustrate Congress' intent to extend a civil remedy for torture to U.S. citizens and produce the illogical and unjust result that *aliens* would be able to sue both natural persons and corporations under the ATS for complicity in torture and extrajudicial killing, but *U.S. citizens* would only be able to seek redress against natural persons. This interpretation of the TVPA makes no sense and should be rejected.

Rather than follow *Middleton*, the district court instead reasoned that the Supreme Court's words of caution in *Sosa*, 542 U.S. at 725-28, required it to take a narrow view of TVPA liability. But no authority indicates that the TVPA should be interpreted differently in light of *Sosa*. *Id. Sosa* cautioned only against recognizing new ATS claims, *id.* at 725, and did not announce a generalized pro-defendant rule of statutory interpretation for all international law claims. Under the ATS, courts fashion private claims out of the law of nations without explicit guidance from Congress. By contrast, in passing the TVPA, Congress created a statutory scheme under which courts must hear torture and summary execution cases. *Id.* at 728, 731; 1991 WL 258662, at *4. Courts should give effect to the TVPA as they would any other statute. The district court erred in failing to do so here.

Finally, even if corporations are not directly liable for TVPA violations, they are indirectly liable for aiding and abetting such violations. The Senate

Report noted that the TVPA allows lawsuits against "persons who ordered, abetted, or assisted in the torture."  1991 WL 258662, at *8.  Courts have generally concluded that "the TVPA permits aiding and abetting liability." *Sinaltrainal v. Coca-Cola Co.*, __ F.3d __, 2009 U.S. App. LEXIS 17764, *5 n.5 (11th Cir. Aug. 11, 2009); *see also Bowoto v. Chevron Corp.*, 2007 WL 2349341, *3-4 (N.D. Cal. Aug. 14, 2007) (defendant may be liable for aiding and abetting even if defendant could not be held liable for the primary violation).  Even if corporations are not considered "individuals" liable for primary violations of the TVPA, they are still "persons" who may be sued for aiding and abetting such violations.  Thus, even if the district court correctly dismissed plaintiffs' TVPA claims under a theory of primary liability, the court should nevertheless have permitted plaintiffs to proceed with their TVPA claims against defendants under an aiding and abetting theory.

Because the district court improperly dismissed all of the Irowarinun family's international human rights claims prior to trial, a new trial is necessary on these claims.

///

///

## VIII.  CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed and the case remanded for a new trial of all claims previously tried as well as the ATS and TVPA claims of the Irowarinun family.


Dated: September 18, 2009          Respectfully submitted,

                                    By:_____s/ *Lauren Teukolsky*_____
                                            Lauren Teukolsky

                                    BARBARA ENLOE HADSELL
                                    DAN STORMER
                                    LAUREN TEUKOLSKY
                                    HADSELL STORMER KEENY
                                    RICHARDSON & RENICK LLP
                                    128 North Fair Oaks Avenue
                                    Pasadena, California 91103-3645
                                    Telephone:  (626) 585-9600
                                    Facsimile:  (626) 577-7079

                                    (Additional counsel on following page)

THERESA TRABER
BERT VOORHEES
TRABER & VOORHEES
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9611
Facsimile: (626) 577-7079

CINDY A. COHN
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333, Ext. 108
Facsimile: (415) 436-9993

RICHARD HERZ
MARCO SIMONS
JONATHAN KAUFMAN
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188
Facsimile: (202) 466-5189

MICHAEL S. SORGEN
LAW OFFICES OF MICHAEL S.
SORGEN
240 Stockton Street, 9th Floor
San Francisco, CA 94108
Telephone: (415) 956-1360
Facsimile: (415) 956-6342

JOSE LUIS FUENTES
SIEGEL & YEE
499 14th Street, Suite 220
Oakland, CA 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

JUDITH BROWN CHOMSKY
LAW OFFICES OF JUDITH BROWN
CHOMSKY
Post Office Box 29726
Elkins Park, PA 19027
Telephone: (215) 782-8367
Facsimile: (215) 782-8368

PAUL HOFFMAN
SCHONBRUN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
723 Ocean Front Walk
Venice, CA 90291
Telephone: (310) 396-0731
Facsimile: (310) 399-7040

ROBERT D. NEWMAN
LAW OFFICE OF ROBERT D.
NEWMAN
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010
Telephone: (213) 487-4727
Facsimile: (213) 487-0242

Anthony Dicaprio
RATNER, DICAPRIO & CHOMSKY,
LLP
110 E. 59th Street
New York, NY 10022
Telephone: (212) 604-9466
Facsimile: (212) 604 9467

RICHARD R. WIEBE
LAW OFFICE OF RICHARD R.
WIEBE
425 California Street, #2025
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

# CERTIFICATION OF COMPLIANCE WITH RULE 32 (a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,879 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect 11 in 14 point, Times New Roman font.


DATED: September 18, 2009     HADSELL STORMER KEENY
                                  RICHARDSON & RENICK LLP

                             By    *s/ Lauren Teukolsky*
                              Lauren Teukolsky
                          Attorneys for Plaintiffs-Appellants

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court.


DATED: September 18, 2009      HADSELL STORMER KEENY
                                    RICHARDSON & RENICK LLP

                               By _____ s/ *Lauren Teukolsky* _____
                                  Lauren Teukolsky
                                Attorneys for Plaintiffs-Appellants

| 9th Circuit Case Number(s) | 09-15641 |

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) _____ .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 09-15641 .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Anthony DiCaprio
Jennifer Green
Judith Brown Chomsky
Marco Simons
Robert Newman

Signature (use "s/" format)     s/ Vanessa Petti